# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| SUSAN M. TOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-04542 |
| | ) | (Consolidated with Nos. 07-cv-06274 and |
| v. | ) | and 08-cv-0610) |
| | ) | |
| | ) | Judge Sharon Johnson Coleman |
| THE STATE OF ILLINOIS | ) | |
| DEPARTMENT OF EMPLOYMENT | ) | |
| SECURITY; JAMES JOHNSON; DIANN | ) | |
| WARE; LIOUBOV VOITYNA[1]; | ) | |
| AMERICAN FEDERATION OF STATE, | ) | |
| COUNTY AND MUNICIPAL | ) | |
| EMPLOYEES (AFSCME), LOCAL 1006; | ) | |
| PATRICIA OUSLEY; RUDELEY | ) | |
| HERRON; and MARK FISHER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff filed a Sixth Amended Complaint [134], alleging discrimination and retaliation based on national origin, hostile work environment, intentional infliction of emotional distress, First Amendment retaliation, and violations of the Illinois Ethics Act.[2] Plaintiff moves for summary judgment [295] against all defendants requesting a default judgment for discovery abuses. The State of Illinois defendants, Illinois Department of Employment Security ("IDES"), James Johnson, Diann Ware, and Lioubov Voityna, move for summary judgment in their favor [299] on Counts I-VIII. The Union defendants, AFSCME Local 1006, Patricia Ousley, Rudeley Herron, and Mark Fisher, move for summary judgment in their favor [303] on Counts X-XI. This Court heard oral

---

[1] Defendant Voityna spelled her name "Voityna," at her deposition. In some places in the briefs and pleadings it also appears as "Voityna." This Court adopts the spelling that defendant herself provided.

[2] The claims in the Sixth Amended Complaint were pared down by the court's ruling on defendants' motions to dismiss, but the previously assigned judge did not mandate that Tomas file a Seventh Amendment Complaint to conform to the ruling. *See* Dkt. 161.

arguments on the motions on January 30, 2018.[3] For the reasons stated herein, the Court denies plaintiff's summary judgment and grants summary judgment in favor of defendants.

**Background**

The following facts are undisputed.[4] Plaintiff, Susan M. Tomas, is Caucasian of Polish descent. (Dkt. 325 at ¶ 4). She filed the instant lawsuit against her former employer, IDES, a State of Illinois agency. (Dkt. 325 at ¶ 5; Dkt. 329 at ¶ 5). Tomas was employed by IDES from August 16, 2001, to November 29, 2007. (Dkt. 325 at ¶ 8; Dkt. 329 at ¶ 4). Throughout her employment with IDES, Tomas was a member of the defendant labor union, American Federation of State, County, and Municipal Employees ("AFSCME"), Local 1006. (Dkt. 325 at ¶ 11). Tomas voluntarily left IDES employment in November 2007 and currently works for the Illinois Department of Human Services as a Human Services Caseworker. (*Id.* at ¶ 24).

During the relevant time frame, defendant James Johnson, African American, was the Local Office Administrator for the IDES Addison office where Tomas worked. (Dkt. 325 at ¶ 6; Dkt. 339 at ¶ 1). Johnson was not Tomas' direct supervisor, but he was her manager. (Dkt. 325 at ¶ 6; Dkt. 339 at ¶ 1).

Defendant, Diann Ware, African American, was a Field Office Supervisor at the IDES Addison office where Tomas worked. (Dkt. 325 at ¶ 7; Dkt. 339 at ¶ 1). Tomas reported directly to Ware when she began working at IDES. (Dkt. 325 at ¶ 7; Dkt. 339 at ¶ 1). Sometime in 2004 or 2005 Ware transferred out of the Addison office. (Dkt. 325 at ¶ 7; Dkt. 339 at ¶ 1).

Defendant, Lioubov Voityna, Caucasian of Ukrainian descent, began her employment with

---

[3] This Court allowed plaintiff's court-recruited counsel to withdraw when she changed firms prior to the hearing. The Court thanks recruited counsel for their nearly seven years of service on this matter.
[4] The facts are taken from the following L.R. 56.1 statement documents: Dkt. 329, the Union defendants' response to Tomas' Statement of Facts ("SOF"); Dkt. 318, the state defendants' response to Tomas' SOF; Dkt. 338, Tomas' response to the Union defendants' statements of additional fact ("SAF"); Dkt. 339, Tomas' response to the state defendants' SAF; Dkt. 323, Tomas' response to the Union defendants' SOF; Dkt. 346, the Union defendants' response to Tomas' SAF; Dkt. 325, Tomas' response to the state defendants' SOF; Dkt. 343, the state defendants' response to Tomas' SAF.

IDES in 2001 as an employment security program representative ("ESPR") in the Addison office. (Dkt. 325 at ¶ 8; Dkt. 339 at ¶ 3). Voityna was promoted to employment security service representative ("ESSR") in approximately 2004. (*Id.*). She was promoted to field office supervisor for the adjudication unit in 2005. (*Id.*). As field office supervisor part of Voityna's job duties included training individuals who were being promoted from ESPR to ESSR, including Tomas. (*Id.*). Voityna still works as a supervisor for IDES, but in a different office. (*Id.*).

Defendant, Patricia Ousley, African American, has been employed by IDES for forty years, and served as AFSCME Local 1006 President from April 1, 2005, to December 18, 2013. (Dkt. 323 at ¶5; Dkt. 338 at ¶ 2). Defendant, Mark Fisher, African American, never worked for IDES, but was a member of AFSCME Local 1006 from 2004 to 2012. (Dkt. 323 at ¶6; Dkt. 338 at ¶ 4). He was steward for AFSCME from the fall of 2005 to the fall of 2008. (*Id.*). Defendant, Rudeley Herron, African American, has been employed by IDES since 2001 and was Chief Steward for the AFSCME Local 1006 for seven or eight years beginning in 2000 or 2001. (Dkt. 323 at ¶7; Dkt. 338 at ¶ 5). Herron held the position of First Vice President and Chief Steward for Local 1006 from 2008 to 2014. (*Id.*).

*Collective Bargaining Agreement and Grievance Procedures*

From July 1, 2004, to June 30, 2008, there was a master collective bargaining agreement ("CBA") in effect between the State of Illinois and the AFSCME Council 31, AFL-CIO, and its affiliated locals, including Local 1006. (Dkt. 323 at ¶ 20). The CBA, Article II, gives management "the exclusive right to manage its operations… including… [t]he right to… evaluate, allocate and assign employees; to discipline…, to make and enforce reasonable rules of conduct…." (*Id.* at ¶ 72). Article V, Section 2 of the CBA provides a ten business day time limit for filing a grievance after an occurrence. (*Id.* at ¶ 32).

The CBA contains a four-step grievance procedure: at Step 1 the employee or the union

must orally raise the grievance with the employees' supervisor, who is outside the bargaining unit. (*Id.* at ¶ 21). At Step 2, if the grievance is not resolved at Step 1, it must be presented in writing by the Union to the Intermediate Administrator or a designee. (*Id.*). At Step 3, if the grievance is still unresolved, then it must be presented by the Union to the agency head or a designee. (*Id.*). For departments outside of DCFS, Revenue, Human Services, and Corrections, the Union is represented by the "3rd Level Grievance Committee," comprised of Union staff and a total of six bargaining unit members representing all other Agencies, and each Agency is represented by the agency head or a designee. (*Id.*). At Step 4, if still unresolved, the Union may appeal the grievance to a pre-arbitration meeting between Illinois Department of Central Management Services staff and Union staff. (*Id.*). It may then be moved to arbitration by the Union. (*Id.*).

When an AFSCME Local 1006 member wanted to file a grievance or have a union representative at a meeting, the member would contact either the on-site steward. (*Id.* at ¶ 25). If there was not a steward on-site, then the member would contact the Chief Steward. (*Id.*). As a steward for AFSCME Local 1006, Fisher, had filed grievances at Step 1 and moved them to Step 2. The Chief Steward, Herron, would then make a decision to advance a grievance from Step 2 to Step 3. (*Id.* at ¶ 26).

The 3rd Level Grievance Committee is a committee of the AFSCME Council 31, not a committee solely for AFSCME Local 1006. (*Id.* at ¶ 22). The 3rd Level Grievance Committee consisted of six elected positions. Ousley was a member of the Committee from 2004, to 2015. (*Id.* at ¶ 23). In 2006, the Committee was made up of three white members and one black member. (*Id.*). The Committee also had one staff member, who was white. (*Id.*). The Committee met once a month to for three to four days to address 100 to 150 grievances. (*Id.*). When considering Step 3 grievances the 3rd Level Committee would have the grievance, the fact sheet, any other documentation that the investigator, being the steward, would have gotten together, and the resolution once complete. (*Id.* at

¶ 24). Most of the grievances did not move on from Step 3 to Step 4. (*Id.* at ¶ 23).

*Tomas' Employment at IDES*

Tomas began her employment as an "intermittent" (non-permanent) ESPR in the Addison office. (Dkt. 318 at ¶ 7; Dkt. 325 at ¶ 10). In July 2002, Tomas received a permanent appointment, through a bidding process, as an ESPR with Polish Option. (Dkt. 325 at ¶ 10). As an ESPR, Tomas processed unemployment claims. (*Id.* at ¶ 12). From 2002 through August 2004, Tomas was meeting expectations and her record was free of counselings, reprimands, or any sort of discipline. (Dkt. 318 at ¶ 8; Dkt. 343 at ¶ 1). Her position was ESPR when she left IDES in November 2007. (Dkt. 325 at ¶ 10).

In January 2005, Tomas tried to assist claimant Karolyn Helaine with her application for benefits. (Dkt. 318 at ¶ 9; Dkt. 329 at ¶ 9). According to Tomas, Helaine worked weekends when she was laid off by her employer, who did not inform Helaine of the lay off until the following weekend. (Dkt. 318 at ¶ 10; Dkt. 329 at ¶ 10). Tomas wanted to backdate Helaine's application to qualify her for benefits, but was instructed not to backdate the application. (Dkt. 318 at ¶ 15; Dkt. 329 at ¶ 15; Dkt. 343 at ¶ 3). Tomas did as instructed, but noted "denial by Ware" as the reason for denial of benefits. (*Id.*).

On July 7, 2006, Tomas and Ousley had an email exchange concerning a position at the Grand Avenue office and Tomas' interest in a job only if it had a Polish option. (Dkt. 323 at ¶ 73). A Polish option means the individual could speak Polish and would get bilingual pay as an option; the option attaches to the job. (*Id.*). Ousley advised her of the Grand Avenue position. (*Id.* at ¶ 74). Tomas was unhappy in that office after not getting the promotion and wanted a transfer. (*Id.*). On July 10, 2006, Ousley advised Tomas that she could not get her into that position, but Tomas could put in a request for transfer to the Evanston office. (*Id.* at ¶ 75).

On August 1, 2006, Tomas was detailed to another local IDES office, the Diversey office, as

an ESPR with Polish Option, and was subsequently detailed back to the Addison office in June 2007. (Dkt. 323 at ¶ 78; Dkt. 325 at ¶ 19). A temporary assignment to another location is called a "detail transfer" in which an employee leaves one position for another position for a particular period of time. (Dkt. 323 at ¶ 76). Tomas' Sixth Amended Complaint concedes this move was a "detail." (Dkt. 145 at ¶ 41). Unlike a "detail," a "transfer" is permanent assignment to another office. (Dkt. 323 at ¶ 76).

*Tomas' "Counselings"*

Oral counseling of an employee is not considered discipline and records of oral counseling do not go to the employee's master file at the Central Office. (Dkt. 325 at ¶ 17). Records of oral counseling remain at the local office and there are no negative consequences, such as docked pay, suspension or similar action, upon an employee receiving oral counseling. (Dkt. 325 at ¶ 17; Dkt. 339 at ¶ 10). The AFSCME Collective Bargaining Agreement expressly states that "counseling and corrective action plans are not considered disciplinary actions." (Dkt. 325 at ¶ 18).

Tomas received oral counseling and reprimands over the course of her employment, but was never formally disciplined. (Dkt. 325 at ¶ 15; Dkt. 339 at ¶ 4). As a result of the oral counseling, Tomas never lost any time, pay, or seniority. (*Id.*). For any oral counseling he gave to an employee as Administrator of the Addison office, Johnson would write a memorandum, documenting the conversation. (Dkt. 325 at ¶ 16; Dkt. 339 at ¶ 9). Johnson never sent any oral counseling memoranda to the Central Office of IDES to be put in an employee's master file. (*Id.*).

On May 25, 2005, Johnson and Ware issued a counseling notice to Tomas for mailing appeals to an incorrect address. (Dkt. 318 at ¶ 19; Dkt. 323 at ¶ 27; Dkt. 339 at ¶ 5). ESPRs handle appeals, which are also called "reconsideration determinations," as part of the usual function of their job. (Dkt. 325 at ¶ 35). Johnson taught Tomas how to handle appeals. (*Id.* at ¶ 36).

Another counseling instance in 2005 involved, Frank Kida, a deaf-mute Polish claimant

sought IDES benefits. (Dkt. 318 at ¶ 20; Dkt. 329 at ¶ 20). His file was assigned to Tomas. (Dkt. 318 at ¶ 20; Dkt. 329 at ¶ 20). On December 15, 2005, Johnson and Ware sent Tomas a memorandum counseling her for the handling of the Kida file, and for making "repeated, ethnically charged remarks to and about Ruben Calderon," who handled the Kida file after Tomas. (Dkt. 325 at ¶ 23; Dkt. 339 at ¶ 6). On December 20, 2005, Calderon emailed Johnson to document the December 15, 2005, incident where Tomas said, "if you are black you get everything." (Dkt. 339 at ¶ 7). That same day, Tomas wrote to Johnson, stating that her conversation with Calderon was regarding his decision to deny Kida benefits, claiming that Ware, as supervisor, should make that decision. (*Id.* at ¶ 19).

On April 6, 2006, Johnson emailed Tomas to advise her that on April 10th he would be issuing an Oral reprimand for insubordinate conduct on April 5, 2006. (Dkt. 323 at ¶ 34; Dkt. 339 at ¶ 12). Johnson further advised her that she could have a Union Steward present if she wished. (Dkt. 323 at ¶ 34). Regarding the April 5, 2006[5], incident Tomas testified that she was given training logs that she claims falsely represented the amount of training Voityna had provided. (Dkt. 343 at ¶ 19). She further testified that Johnson had screamed at her and tried to force her to sign the logs. (*Id.*). Johnson testified that when an employee refuses to sign time logs, he just makes a note of the refusal and moves on. (*Id.*). Tomas testified that she told Johnson and Voityna, who was also present at that meeting, that she was having chest pains and had to have immediate sick leave. (*Id.* at ¶ 20). According to Tomas, they initially refused, but then let her leave. (*Id.*). She went to the hospital where they told her it was stress related. (*Id.*). On April 10, 2006, Johnson issued the oral reprimand with Herron, as Chief Steward, and Voityna, as Tomas' supervisor, present at the meeting. (Dkt. 323 at ¶ 36; Dkt. 346 at ¶ 20). After the meeting, Herron told Tomas he did not think she should grieve the oral reprimand, though Tomas disagreed, she did not pursue a grievance. (Dkt. 323 at ¶ 37).

---

[5] As transcribed in the pleading, the statement of fact refers to April 5, 2005. This Court based on the surrounding facts believes that is a typo and the intended date was April 5, 2006.

There were several other occasions in 2006 on which Johnson counseled Tomas for her conduct, including February 24, April 14, June 14, and June 26. (Dkt. 329 at ¶ 25; Dkt. 339 at ¶¶ 14, 15, 16). It also is undisputed that Johnson orally counseled and wrote counseling memoranda for several non-white employees at the Addison office, including Chiquita Harris, Marie Mora, and DeWitt Jackson. (Dkt. 325 at ¶ 26).

*Tomas' Promotion*

For an employee to move from an employment security program representative ("ESPR") to an employment security service representative ("ESSR") position, she must have seniority and a promotional grade from CMS. (*Id.* at ¶ 53). The standard probationary period for employees promoted from ESPR to ESSR is four months. (*Id.* at ¶ 47). On March 1, 2006, Tomas reached the top of the promotion list and was promoted to ESSR, subject to a four-month probationary period ending June 30, 2006. (Dkt. 318 at ¶ 26; Dkt. 325 at ¶ 52; Dkt. 329 at ¶¶ 26, 27; Dkt. 339 at ¶ 11). The probationary period determines whether an individual can perform the duties of the job and be eligible for certification in that title. (Dkt. 325 at ¶ 49). Tomas began work in her new role on April 3, 2006. (Dkt. 346 at ¶ 15). Johnson testified that he was happy that Tomas was promoted because he always needed more people to do the work. (Dkt. 325 at ¶ 56).

An ESSR works on more complicated cases than an ESPR. (Dkt. 325 at ¶ 42). An ESSR performs additional adjudications on the major issue (voluntary leaving versus discharge) in addition to what an ESPR performs. (*Id.* at ¶ 43). The claimant interview process is the same for both positions and was guided by the Illinois Benefits Informational Systems ("IBIS") system that supplied questions for the ESPR or ESSR to ask the claimant. (*Id.* at ¶ 45). IDES employees who needed training had access to online training resources for the IBIS. (*Id.* at ¶ 21). Tomas testified that she received IBIS training. (*Id.* at ¶ 23).

Voityna supervised the on-the-job training of probationary ESSRs, including Tomas. (*Id.* at

¶¶ 31, 63). New ESSRs are given the same statewide training plan, including a calendar as to how to assign cases during the probationary period, they start with five cases a day four days a week with Friday being the backlog day and then increase to ten cases a day. (*Id.* at ¶ 54). Tomas received the same training as all other employees placed into the probationary period for an ESSR. (*Id.* at ¶ 59). Voityna allowed Tomas to observe her while interviewing claimants. (*Id.* at ¶ 55). Tomas was assigned twenty cases the first week, but did not complete her cases by Friday. (*Id.* at ¶ 64). Voityna provided a daily log of Tomas' progress during the probationary period. (*Id.* at ¶ 61). Voityna stopped assigning her cases. (*Id.* at ¶ 66).

Johnson personally observed Tomas' training. (*Id.* at ¶ 60). He also requested an extension for Tomas' probationary period because she was not learning the work in the allotted time. (*Id.* at ¶ 57). The probationary period could only be extended if the employee was on an official leave of absence. (*Id.* at ¶ 51). During the period of March 1, 2006, to May 16, 2006, Tomas received poor performance reviews. (Dkt. 318 at ¶ 35). Tomas was insubordinate to her supervisors, particularly Voityna. (Dkt. 325 at ¶ 67).

Because Tomas was not performing adequately, Johnson recommended that Tomas not become an ESSR. (Dkt. 325 at ¶ 58). Voityna was not involved in the decision to return Tomas to the ESPR position. (*Id.* at ¶ 72). On May 18, 2006, Tomas' supervisors issued an evaluation of Tomas' ESSR probation. (Dkt. 323 at ¶ 40). They recommended she return to her prior role as ESPR due to her inability to perform the job duties of ESSR. (*Id.* at ¶ 40). IDES provided Tomas with the following notice:

> You are hereby notified that, in accordance with CMS Personnel Rule 302.320, Failure to Complete Probationary Period, you are being involuntarily returned to your former position of ES Program Representative, effective June 28, 2006, prior to the completion of your four (4) month promotional probationary period. This action is being taken as a result of your inability to perform the duties of the ES Service Representative position for which you were promoted, effective March 1, 2006.

(*Id.* at ¶ 41). CMS Personnel Rule 302.320 states: "An employee may not be promoted, demoted,

discharged, or transferred during the probationary period without the approval of the Director. (Dkt. 318 at ¶ 36). On June 30, 2006, after the probationary period was complete, Tomas was returned to her ESPR role because she did not meet the requirements to pass probation. (Dkt. 325 at ¶¶ 69, 71). She received the higher ESSR salary for the entire four-month probation. (*Id.* at ¶ 70). Article XXVII of the CBA stipulates that two evaluations be given during the probationary period with one at the mid-point and the second two weeks prior to the end of probation. (Dkt. 318 at ¶ 37).

Johnson testified that at least one employee of Polish descent was promoted at the Addison office during the relevant time. (Dkt. 325 at ¶ 26). Voityna trained a woman of Polish descent, Agnieszka Szczanik, in the ESSR position, and she was later promoted from ESSR to field office supervisor in the Addison office. (*Id.* at ¶ 32). Tomas admitted that another Polish employee at IDES, Danuta Lech, was promoted to ESSR and that Voityna did not have an adversarial relationship with her. (*Id.* at ¶ 41).[6]

Voityna was supervising Equilla Simms, an African American woman, during her ESSR probationary period when Simms was returned to an ESPR position at the end of her probationary period. (*Id.* at ¶ 33). Simms voluntarily returned to her ESPR position, but was promoted a year later to ESSR. (Dkt. 343 at ¶ 31).

*Grievance I: Promotion*

When Tomas failed to pass probation, Chief Steward Herron contacted Fisher and instructed him to contact Tomas. (Dkt. 323 at ¶ 42). On May 18, 2006, Fisher emailed Tomas his contact information, so she could send him whatever documentation that she had and to follow-up with him, which she did. (*Id.* at ¶¶ 43, 44). Fisher met with Tomas in late May to discuss her

---

[6] Plaintiff presents several facts about other IDES employees' promotions, demotions, and discipline, the only citation for which is plaintiff's own declaration that does not set forth a proper foundation for establishing that any of that information is within her personal knowledge. Therefore, the Court disregards paragraphs 31-40 of docket 325, Plaintiff's Statements of Additional Fact in opposition to the State defendants' motion for summary judgment.

grievance regarding her failure to pass probation. (*Id.* at ¶ 45). Based on the documents that Tomas

provided, including her evaluation, Fisher believed the issue was appropriate for a grievance. (*Id.* at ¶

45). In their meeting, Tomas informed Fisher of what she viewed as harassment, the shortened

period of probation, and the lack of training. (*Id.* at ¶ 46). Fisher then contacted management. (*Id.* at

¶ 46). Tomas emailed Fisher on May 25, 2006, regarding the grievance against Johnson and Voityna.

(*Id.* at ¶ 48).

> Fisher filed a grievance on Tomas' behalf on May 30, 2006, stating:
>
> On May 16, 2006, IDES evaluated Susan Tomas probationary ES Service
> Representative. This evaluation was conducted 1 ½ months into the probation
> period. As a result of this evaluation, Susan Tomas was found not to pass the 4
> month probationary period. This action violated Article XXVII (Evaluations) and
> any other relevant contract provisions.
>
> Remedy Sought:
>
> That Susan Tomas be returned to her probationary status as an ES Service
> Representative and be allowed to finish the 4 month probationary period.

(*Id.* at ¶ 50). At Step 1 of the grievance procedure, Fisher met with Johnson and Voityna, who

informed him that they were not going to return Tomas to the ESSR position because she lacked

the "wherewithal to do the position." (*Id.* at ¶ 49).

Fisher moved the grievance to Step 2, by presenting the grievance to IDES regional

administrator, William Jamison, who was the Step 2 administrator for all IDES grievances. (*Id.*).

Jamison chose not to meet with Fisher and, according to Fisher, was not responsive within the

contractual time frame. (*Id.* at ¶ 51). Fisher informed Herron that Tomas' grievance should advance

to Step 3. (*Id.*). Jamison then denied the grievance at Step 2 on June 14, 2006, based on management

and supervisor observation that Tomas was unable to perform the essential duties of an ESSR and,

as such, was returned to her ESPR duties on week 11 of a 17 week probation period. (*Id.* at ¶ 52).

Fisher turned his grievance file over to Herron, who advanced it to Step 3 on June 29, 2006,

by filing it with the IDES labor relations department and faxing it to AFSCME Council 31 in

Springfield. (*Id.* at ¶ 53). Fisher emailed Tomas to inform her that he had advanced the grievance to Step 3, advising her that the 3rd level of the process involves other Union officials and management attempting to resolve the grievance. (*Id.* at ¶ 55). On September 20, 2006, Tomas' grievance was withdrawn without prejudice or precedent at Step 3, ending the grievance process. (*Id.* at ¶ 56). Third level resolutions generally do not have an explanation and there are no minutes taken at third level meetings. (*Id.*).

*Grievance II: Harassment*

Tomas often complained about African American employees and that her supervisors were "abusing" her and "lying." (*Id.* at ¶ 13). Tomas also testified that she had to do "gofer" work when other employees in her office did not have to do menial tasks. (*Id.* at ¶ 14). Voityna testified that her job duties when she was an ESPR consisted of "various jobs," including filing documents in the filing room, and "everything that was assigned to me." (*Id.* at ¶ 28). Johnson and Voityna met with Tomas and her union representative, Patricia Ousley, to discuss Tomas' complaints of harassment. (*Id.* at ¶ 73).

On June 14, 2006, Johnson emailed Tomas, stating that he could not grant her request to have another employee present every time she spoke to management and that having a union representative present every time management wanted to give her instructions would be impossible. He suggested a meeting with AFSCME and Management to resolve the issue. (*Id.* at ¶ 57).

That same day, Ousley emailed Tomas to inform her that she would be present at the meeting the following Friday. (*Id.* at ¶ 58). Johnson emailed Tomas again on June 14, requesting a detailed account of all instances where she considered herself abused before meeting that was to take place the following Friday. (*Id.* at ¶ 59). On June 16, 2006, Tomas emailed Ousley and Fisher to tell them she wanted to file grievances against Johnson and Voityna for mental and verbal abuse and retaliation. (*Id.* at ¶¶ 60-61). In response to the request from Johnson for a list of incidents, Tomas

compiled the following list while claiming many more instances:

- On February 25, 2006, she was threatened by Johnson for requesting a grievance against Voityna, "You better not do this, because you will see."
- On April 3, 2006, Voityna was screaming at her in front of the whole office.
- On April 5, 2006, Johnson and Voityna "abused and brainwashed" her in the office for 20 minutes about signing daily logs with lies.
- On April 10, 2006, Johnson and Voityna mentally and verbally abused her about going to the hospital for chest pains. Tomas says she was written up the following day for improper behavior and that "[i]t was like [she] was given a surgery without anesthesia and couldn't scream because of the pain."
- On April 13, 2006, Voityna could not answer any of her questions without a terrible attitude.
- On April 28, 2006, Johnson abused her when he accused her of behaving improperly with a claimant. He backed down when Tomas said she would call a regional manager.

(*Id.* at ¶ 62). Tomas told Ousley that she was afraid to speak to Johnson and Voityna alone. (Dkt. 346 at ¶ 23).

Johnson sent an email memorandum to himself, Voityna, and Ousley, responding to Tomas' list of incidents. (Dkt. 323 at ¶ 69). The memorandum states in part:

This meeting gives you a platform to air your issues with a union official present. It is also an attempt to avoid discipline and set some ground rules for working together.
…
My response to your list of issues:
1. February 25, 2006 was a Saturday. I don't recall talking about grievances. But, I would not intentionally tell you not to file unless we could settle the matter with a grievance as the contract states we should
2. April 3, 2006 Luba screaming at you: must be reported right away. We must all try harder to remain civil and respectful.
3. Signing appeal logs is part of your job. Repeatedly say [sic] everyone that talks to you is lying is rude and disrespectful. It also breaks down communication. You must stop using derogatory and accusing language. State your position after you understand what is being said.
4. [April 10, 2006] talking to you about the work will continue. How you respond is really important. Try and not view every conversation as a negative experience. We will make every effort to be professional and polite. You must do the same. You[r] behavior on that day was totally uncontrollable. You were so upset you would not listen or follow instructions. That cannot continue.
5. See #4
6. You must be able to ask questions and get answers. We all must work on making that a simple process without drama.
7. Again, your account about every conversation should not start off with words like "abuse" and "lies." Different accounts about what occurred will happen. You were talking on speaker phone to Evelyn, you did say the claim was lost. This was not a

13

big deal. All we wanted was for everyone to understand that the claimant shouldn't over hear or be told this unless all items have been checked. This message was sent to everyone. You overreacted. I stopped the conversation to keep from going forward with discipline on you[r] behavior. Not the fact that the claimant overheard or was told the claim was deleted. This is the central theme of this meeting. You must stop reacting so violently to the normal conversations that must occur to get out work done correctly.

8. You cannot work here without being supervised, managed, instructed, directed, and monitored. You don't need to fear these interactions. You need to listen, understand and follow instructions. All we do here is about the people we serve. We will talk to you about the work items need to do that service. You must behave in a civil fashion. This means cut out the inflammatory language. Listen when we talk and we will listen when you talk. No rude interruptions.

(*Id.*).

Ousley met with Tomas on June 16, 2006, for forty-five minutes before the meeting with Johnson. (*Id.* at ¶ 63). After Tomas explained that Johnson and Voityna were harassing her, Ousley said she would investigate. (*Id.*). Tomas suggested that Ousley talk to Mr. Sonneberg, Mr. Squires, Mr. Payne, a person named Alfredo, and one other person. (*Id.* at ¶ 64). Tomas testified that she did not know whether Ousley had spoken to any of these individuals. (*Id.* at ¶ 62). Ousley stated in her declaration that she interviewed the following co-workers of Tomas: Charles Johnson (African American), Jackie Hardiman (African American), Evelyn Calderon (white Hispanic), Maritiza Arroyo (Hispanic), Jose Crespo (Hispanic), Roy Sonenberg (white). (Dkt. 323 at ¶ 65). Ousley also interviewed James Johnson and Voityna. (*Id.* at ¶ 65). None of them corroborated Tomas' claims of harassment. (*Id.*). Both Charles Johnson and Jackie Hardiman worked in an open office with Tomas less than twenty feet away. (*Id.* at ¶ 67). Based on her meeting with Tomas, her interviews with people in the Addison office, and the meeting Tomas and she had with Johnson, Ousley concluded that there was not a violation of the collective bargaining agreement that justified filing a grievance. (*Id.* at ¶ 71).

On June 16, 2005, Tomas emailed Ousley to begin the grievance process against Ware and Voityna to which Ousley replied with contact information for Herron, Chief Steward. (*Id.* at ¶ 28).

Although Herron did not recall a conversation with Tomas around June 16, 2005, Tomas testified that she called him to file a grievance against Ware and Voityna for harassment and failure to provide training. (*Id.* at ¶ 29). Tomas testified that she presumed a grievance was filed on her behalf. (*Id.*). Tomas sent a letter to the Illinois Labor Relations Board dated October 7, 2006, regarding the June 16, 2005, grievance she filed against Ware and Voityna for which she had not received a response from the union. (*Id.* at ¶ 31). Herron testified that he knew both Ware and Voityna, but had very little contact with either of them. (*Id.* at ¶ 33).

Ousley responded to an email from Tomas on August 2, 2006, stating that in addition to requesting her personnel file from Human Resources, she should also request her supervisor's file from Johnson. (*Id.* at ¶ 80). Thereafter, Ousley and Tomas had a meeting with management for Tomas to see her personnel file. (*Id.* at ¶ 81). The meeting came about because Johnson called Ousley and asked her to come out to the office because he had an employee (Tomas) who wanted to see her personnel file and he needed a union representative present. (*Id.*). Ousley, Tomas, Johnson, and Voityna attended the meeting. (*Id.* at ¶ 82).

*EEOC Charges*

Tomas filed an EEOC charge of discrimination on January 5, 2006, against IDES alleging race discrimination based on a written discipline she received even though there was no continuing action. (Dkt. 325 at ¶ 74). Tomas testified that non-white employees received "friendly" write-ups unlike hers. (*Id.* at ¶ 76). She filed a second EEOC charge of discrimination against IDES on June 27, 2006, alleging national origin discrimination (Polish) and retaliation for her previous charge of discrimination. (*Id.* at ¶ 77). On December 4, 2006, Tomas filed an EEOC charge against AFSCME, claiming discrimination on the basis of national origin and retaliation that occurred from May 4, 2005, to December 4, 2006. (Dkt. 323 at ¶14).

Ware never made any statements to Tomas, or any other IDES employees, about her race or

national origin or referenced her EEOC charge. (Dkt. 325 at ¶ 37). Johnson also never made any statement to Tomas about her race, national origin, or EEOC charge. (*Id.* at ¶ 38). Neither Ousley, Herron, nor Fisher made any anti-Polish or anti-white statements to Tomas and no one ever told Tomas that the union defendants ever made such statements. (Dkt. 323 at ¶¶15, 16, 17).

Tomas testified that she believed Voityna hated her with a "passion," but she conceded Voityna never made any specific comments regarding Tomas' Polish heritage either to Tomas or any of her coworkers. (Dkt. 325 at ¶ 39). Nor could Tomas recall Voityna making any remarks about Tomas' EEOC charge. (*Id.* at ¶ 40).

*Voityna and Gifts*

Tomas alleges that Voityna was accepting gifts in exchange for favorable benefit determinations. In support of this allegation, she testified that on one occasion she saw an individual leave Voityna's office and when Tomas went in there "under false pretenses" she saw Voityna putting a box into a bag. (Dkt. 339 at ¶ 22; Dkt. 343 at ¶ 26). Tomas emailed Voityna, stating that she saw Voityna taking bribes because she saw her packing a box into a bag. (Dkt. 339 at ¶ 22). Tomas also testified to a second occasion when she saw an "old client" visit Voityna with a bag, but the client not have the bag when she left. (Dkt. 339 at ¶ 23; Dkt. 343 at ¶ 26). Voityna testified that she had never received money or gifts from any IDES claimants. (Dkt. 339 at ¶ 24). Tomas never raised her concerns about bribes with the police or the Office of the Executive Inspector General (*Id.* at ¶ 21).

*Discovery Issues[7]*

Discovery revealed that neither IDES nor AFSCME Local 1006 issued litigation holds. (Dkt. 329 at ¶ 43). Emails that IDES employees had deleted prior to 2009 are irretrievable. (*Id.* at ¶ 44). Ousley testified that no one asked her to save documents related to the case and, thus, she had not

---

[7] This case was reassigned from the Honorable James B. Zagel to this Court on December 9, 2016.

done so. (*Id.* at ¶¶ 45, 46). Tomas produced 100 emails between herself and Johnson, Ware, or Voityna. (Dkt. 339 at ¶ 29). It is undisputed that CMS took over management of IDES email systems in 2007 and the migration of data from IDES' system, which took place from June 2007 to October 2007, and included only the general mailboxes. (*Id.* at ¶ 31). Emails from the IDES mailboxes of Tomas, Johnson, Voityna, and Ware, were migrated in the transition. (*Id.* at ¶ 32). In 2009, CMS implemented a new system that automatically emptied the trash or deleted folders every 14 days. (*Id.* at ¶ 33). On November 10, 2014, Tomas filed a motion for sanctions against IDES, which the Court granted on February 26, 2015. (Dkt. 329 at ¶¶ 47, 48). Tomas also moved for sanctions against AFSCME Local 1006 on August 5, 2015, which the Court granted on November 9, 2015. (*Id.* at ¶¶ 49, 50).

Tomas had taken the depositions of all defendants, but Tomas still needed two additional pieces of discovery from the IDES defendants. Tomas sought (i) information regarding the claim file of Frank Kida (the "Kida File"); and (ii) information regarding the compensation of ESPRs and ESSRs. (*Id.* at ¶ 51). IDES produced Jeannette Okulinski as a Rule 30(b)(6) witness, even though she could only testify about the compensation of ESPRs and ESSRs for certain years, but not the ones requested. (*Id.* at ¶¶ 53, 55). IDES admitted that it was not able to produce the ESPR and ESSR compensation information for the years between 2003 and 2007. (*Id.* at ¶ 66). IDES admitted that the Kida File had been destroyed. (*Id.* at ¶ 65). IDES produced the record of decision on Kida's claim for benefits. (*Id.* at ¶ 39). Any other documents would have been destroyed by 2010 pursuant to IDES' document retention policies. (*Id.*).

Plaintiff filed three separate cases that were eventually consolidated into the one now before the Court. The Sixth Amended Complaint contained eleven counts, but only the following survived the motion to dismiss, which was granted in part and denied in part: Count I (Title VII race discrimination against IDES); Count II (Title VII national origin discrimination against IDES);

Count III (retaliation, race and national origin discrimination against Ware, Johnson, and Voityna in violation of 42 U.S.C. §1981, 1983); Count IV (hostile work environment against Ware, Johnson, and Voityna in violation of 42 U.S.C. §1981); Count V (intentional infliction of emotional distress against Johnson and Voityna); Count VIII (retaliation under the Illinois Ethics Act against Ware, Johnson, and Voityna); and Count X (Title VII national origin discrimination and retaliation against AFSCME Local 1006). Because the Sixth Amended Complaint did not specify the basis for the discrimination claim it is unclear whether Count XI survived dismissal. This Court will assume that if that Count survived at all, it is only the race discrimination claim. The claims for backpay and lost benefits were also stricken.

**Legal Standard**

Summary judgment is proper when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017), *reh'g denied* (Mar. 27, 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); Fed. R. Civ. P. 56(a). In deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as true and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). On cross-motions, summary judgment is appropriate only when evidence as a whole shows there is no genuine dispute as to any material fact, *Davis v. Time Warner Cable of Southeastern Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011), regardless of which motion the evidence is attached. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

**Discussion**

*1. Tomas' Motion for Summary Judgment*

Tomas moves for summary judgment against all defendants, requesting default judgment in her favor based on discovery abuses. Both IDES and AFSCME were sanctioned by the previous trial judge for the failure to issue formal litigation holds and for failure to produce (and subsequent loss) of emails. Plaintiff Tomas also moves for summary judgment in her favor, arguing that the undisputed facts when viewed with an adverse inference demonstrate that she is entitled to summary judgment on Count VIII for retaliation in violation of the Illinois Ethics Act, 5 ILCS 430/15-10, *et seq.* This Court will address each argument.

*a. Default Sanction*

Tomas asserts (and defendants largely admit) that no formal litigation holds were issued. Tomas requests either default judgment for the "destruction of evidence" or, alternatively, an adverse instruction. Defendants (both IDES and AFSCME) admit that they did not issue formal litigation holds.

To order dismissal or to issue an adverse instruction based on spoliation (the destruction of evidence), the Court must find that the destruction of the material was done in bad faith. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *S.C. Johnson & Son, Inc. v. Louisville & Nashville R. Co.*, 695 F.2d 253, 258 (7th Cir. 1982). "That the documents were destroyed *intentionally* no one can doubt, but 'bad faith' means destruction for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir.1998). "The crucial element is not that the evidence was destroyed but rather the reason for the destruction." *S.C. Johnson & Son, Inc.*, 695 F.2d at 258. "In civil cases, the facts underlying a district court's decision to dismiss the suit or enter a default judgment as a sanction under Rule 37 or the court's inherent authority need only be established by a preponderance of the evidence." *Ramirez v. T&H*

*Lemont, Inc.*, 845 F.3d 772, 781 (7th Cir. 2016), *cert. denied*, No. 16-1418, 2017 WL 2339748 (U.S. Oct. 2, 2017) (overruling *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003), which had previously declared the standard to be clear and convincing evidence). Thus, after *Ramirez*, the Court must find evidence of willfulness, bad faith or fault by the noncomplying party by a preponderance of the evidence.

The undisputed evidence here does not support a finding of bad faith. Tomas does not present any basis for this Court to infer that the destruction of certain evidence was done with the intention of hiding adverse information. Both the IDES and AFSCME defendants admit that they did not issue a formal litigation hold, that emails deleted before 2009 when CMS migrated its employees from the GroupWise email application to Outlook are irretrievable, that AFSCME only maintained paper files on grievances (thus, any electronically stored information relating to grievances was not preserved), that the Kida file was destroyed in the ordinary course of file destruction carried out by IDES.

This is clearly not the type of alleged discovery abuse that would warrant a default judgment. Tellingly, Tomas did not request default as relief in her sanctions motions. Tomas can point to no evidence that defendants' intentional destruction (or failure to preserve) evidence was intended to conceal adverse information. Even taking Tomas at her word that Mr. Kida was denied improperly of IDES benefits, there is nothing to suggest that the production of the actual file would provide any more evidence for retaliation than what is in the record by other means. With respect to the missing emails, her arguments regarding bad faith are predominantly based on pure speculation. Tomas herself preserved over a hundred emails just between herself and Ousley and yet she can point to none to support her claims of harassment, retaliation, and discrimination. Therefore, the Court declines to impose additional sanctions.

*b. Illinois Ethics Act*

Tomas also moves for summary judgment in her favor, arguing that the undisputed facts when viewed with an adverse inference demonstrate that she is entitled to summary judgment on Count VIII for retaliation in violation of the Illinois Ethics Act, 5 ILCS 430/15-10, *et seq.* "The Ethics Act prohibits retaliation based on a state employee's disclosure of an activity, policy, or practice that she reasonably believes violates a law, rule, or regulation." *Harris v. Illinois*, 753 F. Supp. 2d 734, 743 (N.D. Ill. 2010) (Lefkow, J.). To prove a violation of the Ethics Act, Tomas must establish that (1) she engaged in protected conduct and (2) that such conduct was a "contributing factor" in the retaliatory action alleged by the State employee. 5 ILCS 430/15–20; *Hosick v. Chicago State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956, 974 (N.D. Ill. 2013) (Lee, J.). There is no violation however if the State defendants would have taken the same unfavorable personnel action in the absence of that conduct. *Id.*

Here, the only protected activity under this statute is Tomas' claim that defendant Voityna was accepting gifts from clients in exchange for favorable IDES benefit determinations. Tomas concedes, that she did not disclose these allegations to the OIEG or to the police. Instead, she emailed Voityna. Yet, Tomas' accusation against Voityna is purely speculative. She saw Voityna pack a box into a bag and on another occasion observed an old "client" visit Voityna with a bag, but left her office without the bag. Tomas concludes this is evidence of bribe taking. There is also no evidence that this accusation was a contributing factor to any adverse personnel action. As will be discussed further below, the undisputed record shows that Tomas was not performing well during her probationary promotion. She conceded that she was overwhelmed by the work. Thus, Tomas is not entitled to judgment in her favor on this Count. Accordingly, Tomas' motion for summary judgment is denied.

*2. The State Defendants' Motion for Summary Judgment*

The State of Illinois defendants, IDES, Johnson, Ware, and Voitnya, move for summary judgment in their favor.

*a. Race and National Origin Discrimination and Retaliation*

In counts I and II, Tomas claims discrimination and retaliation in violation of Title VII based on her race (white) and national origin (Polish). To determine whether the evidence supports a finding of discrimination, the Court asks whether the evidence would permit a reasonable factfinder to conclude that Tomas' race or national origin caused the adverse employment action. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Both Johnson and Ware are African American and Voitnya is white and of Ukrainian national origin.

Because she is white and asserting race discrimination, Tomas' claim is subject to a slightly modified standard than the one employed for protected classes. [8] *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999). To survive summary judgment, Tomas must show that: (1) "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand; (2) [s]he was meeting [her] employer's legitimate performance expectations; (3) [s]he suffered an adverse employment action; and (4) [s]he was treated less favorably than similarly situated individuals who are not members of [her] protected class." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016). If Tomas establishes each of these elements for a *prima facie* case, the burden shifts to defendants to provide a legitimate, non-discriminatory reason for the adverse employment decision. *Id.* If defendants meet their burden, then Tomas must show that the reasons given by defendants are a pretext for discrimination. *Id.*

The State defendants argue that there is no evidence in the record to support the first

---

[8] Tomas has not asserted a "class of one" claim of discrimination.

element. This Court agrees. In fact, defendant Voityna, Tomas' supervisor, is an example that undermines Tomas' claim. She is white and began her career around the same time as Tomas in the same position and office. Voityna has been promoted several times, including to the ESSR position at Addison. Additionally, there were two other Polish women, Agnieszka Szczanick and Danuta Lech, who were promoted in these same roles at IDES. Thus, there is nothing "fishy" in the record. *See Phelan v. City of Chicago*, 347 F.3d 679, 685 (7th Cir. 2003) (finding no support for reverse discrimination where the plaintiff was a white man, his superiors were white men, and the worker selected to replace him was white.) It is also undisputed that Johnson orally counseled and wrote counseling memoranda for several non-white employees at the Addison office, including Chiquita Harris, Marie Mora, and DeWitt Jackson.

The undisputed record also demonstrates that Tomas was not meeting IDES' performance expectations during the probationary period for her promotion. Tomas conceded in her deposition that she was overwhelmed by the duties. The undisputed facts also show that Tomas received the same on the job training as other ESSRs during their probationary period. There is also undisputed evidence that non-white employees experienced the same failure to pass probation for the ESSR role.

Tomas complains of oral and written reprimands as adverse employment actions. She concedes that she never suffered "tangible job consequences" from any counseling and the CBA affirmatively states that oral counseling and reprimands are not discipline. *See Oest v. Ill. Dep't of Corrections,* 240 F.3d 605, 613 (7th Cir. 2001) (reprimands do not constitute adverse employment actions unless accompanied by "tangible job consequences"). Tomas also claims that she suffered an adverse employment action when defendants returned her to her ESPR position. There is no question, however, that the promotion was subject to a probationary period and no evidence that Tomas was meeting expectations. CMS Personnel Rule 302.320 allows for the return of an employee

to the prior role during the probationary period with the approval of the director. It is undisputed that her supervisor and office administrator escalated the issue up the command chain and that their recommendation that she be returned to her previous classification as an ESPR was followed. Furthermore, Tomas concedes that she received the higher pay of an ESSR for the entirety of the probation and, thus, there were no tangible job consequences. Lastly, Tomas fails to present any admissible evidence of similarly-situated non-white employees who were treated more favorably.

The analysis is the same for Tomas' national origin discrimination claim. The basis of this claim seems to be that Ukrainians, particularly defendant Voityna hate Poles. The record is devoid of any evidence to support this claim. Tomas admitted that none of the individual defendants made any derogatory comments about her national origin. The record also shows that two other women of Polish descent worked at IDES and were promoted.

Tomas also alleges that IDES retaliated against her after she filed her first EEOC charge of discrimination (race). She alleges that defendants belittled her in front of other employees, assigned her a heavier caseload, failed to provide adequate training, reprimanded and criticized her work performance, and refused to transfer her to another office. To establish a Title VII retaliation claim, Tomas must show that (1) she engaged in a statutorily protected activity, (2) she suffered a materially adverse action, and (3) a causal connection between the two. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). An action is materially adverse if it might have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

It is undisputed that Tomas filed an EEOC charge on January 5, 2006, and that is protected activity. However, even if this Court were to find a question of fact on the second element of a materially adverse action, Tomas has not demonstrated any connection between the two except by alleged temporal proximity and adverse inference. There is nothing in the record to show that the

individual defendants were aware of her EEOC charge between February and June of 2006 (from the filing of her charge to the end of her probationary period). The relevant decision-makers need to be aware of the protected activity at the time they took the adverse action to show a causal connection. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (it is not enough that the defendant could have or should have known of the protected activity, the defendant must have actual knowledge). Thus, even assuming a materially adverse action was taken, there is nothing to show that Johnson or Voityna knew anything about the charge of discrimination and Tomas cannot establish her claim.

Count III under 42 U.S.C. § 1983, alleging Tomas was denied equal protection because of her race, fails for the same reasons as her Title VII reverse discrimination claims. *See Friedel v. City of Madison*, 832 F.2d 965 (7th Cir. 1987) ("When the plaintiff alleges intentional discrimination ... it is clear that the same standards in general govern liability under sections 1981, 1983, and Title VII.").

In Counts III and IV Tomas asserts claims under 42 U.S.C. § 1981 for discrimination, retaliation, and hostile work environment. Defendants argue that they are State actors and employees and therefore § 1983 provides the exclusive remedy for allegations against state actors. "[Section] 1981 itself provides a remedy for violations committed by private actors, but an injured party must resort to § 1983 to obtain relief for violations committed by state actors." *Campbell v. Forest Pres. Dist. of Cook Cnty, Ill.*, 752 F.3d 665, 667 (7th Cir. 2014) (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 731–35, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Tomas argues that this should not be grounds for dismissal because state actors can violate § 1981, but the *remedy* is found in § 1983. She does not otherwise argue that there is a factual question as to hostile work environment, and the discrimination and retaliation claims would rise and fall as asserted under § 1983. This Court has already addressed the merits of her section 1983 claims. Thus, this Court grants summary judgment in favor of defendants on Counts III and IV.

*b. Intentional Inflication of Emotional Distress*

Count V raises an intentional infliction of emotional distress claim Tomas does not even allege conduct that rises to the level of extreme and outrageous conduct. To establish her claim for intentional infliction of emotional distress under Illinois law, Tomas must prove: (1) her supervisor's conduct was objectively extreme and outrageous; (2) Johnson and Voityna either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) that conduct in fact caused severe emotional distress. *Welsh v. Commonwealth Edison Co.,* 306 Ill.App.3d 148, 239 Ill.Dec. 148, 713 N.E.2d 679 (1999); *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806 (1988). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Rosas v. BB Holdings P'ship,* 362 F. Supp. 2d 986, 991 (S.D. Ill. 2005) (quoting *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765 (1976)). Defendants argue that Tomas has only raised bare legal conclusions stating that defendants' conduct was a "campaign of extreme mistreatment" without providing supporting evidence of that conclusion. This Court agrees. The record reflects that she was given multiple oral counselings, which Johnson memorialized in emails, but there is simply no evidence beyond Tomas' subjective testimony to show the severity of conduct necessary to support such a claim.

*c. Illinois Ethics Act*

Defendants argue that there is no genuine issue of material fact because plaintiff must have a "reasonable belief" that another State employee violated a law, rule, or regulation. 5 ILCS 430/15-10. As discussed above with respect to Tomas' motion, the sole basis for her claim is that she saw Voityna put a box into her bag after someone left her office and that she saw someone go into Voityna's office with a bag and then leave without a bag and that this somehow equals bribery. Voityna testified that she has never accepted bribes or gifts from any claimants. Even drawing all reasonable inferences in Tomas' favor, her claims are far too speculative. Defendants are entitled to

judgment as a matter of law on Count VIII.

*3. The Union Defendants' Motion for Summary Judgment*

The union defendants, AFSCME Local 1006 and Ousley, Herron, and Fisher, move for summary judgment on the remaining counts against them as well as an affirmative defense.

*a. National Origin Discrimination and Retaliation*

Count X alleges national origin discrimination and retaliation against the union defendants under Title VII. Count XI alleges race discrimination and retaliation under § 1981. The Title VII discrimination analysis is the same for unions as other employers, thus, Tomas must show that the union defendants took action against her or failed to represent her for a discriminatory reason. *See Green v. AFT/IFT Local 604*, 740 F.3d 1104, 1106 (7th Cir. 2014). As noted above, courts analyze discrimination claims according to the same framework regardless of whether the claim is under Title VII or § 1981. Tomas' claims stem from her grievances with the union and her belief that Ousley and Johnson were good friends and he thwarted her grievances for that reason. The undisputed facts show that four step grievance process was followed. The record is devoid of any evidence that the Union defendants failed to represent Tomas. The record in fact affirmatively demonstrates that Ousley, Herron, and Fisher assisted Tomas at every turn within the bounds of their role with the Union despite some of the bare and illogical claims. Based on the substantial record establishing that each of the Union defendants followed protocol and were responsive to Tomas' grievances, this Court finds they are entitled to summary judgment in their favor.

*b. Affirmative Defense: Immunity*

The union defendants also request summary judgment in their favor of their third affirmative defense. Ousley, Herron, and Fisher assert that they are immune from individual liability for acts undertaken on behalf of the union. They argue that their actions with respect to Tomas were taken in each of their capacities as a union agent whose role was to enforce the collective bargaining

agreement and represent the interests of bargaining unit members. Defendants rely on *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 247-49 (1962), for the proposition that individual damage actions may not be maintained against union agents or members even if such claims are brought in separate counts or actions in contract or in tort. Having already found that there is no genuine issue of material fact to support Tomas' discrimination and retaliation claims, this Court need not address the merits of the affirmative defense.

**Conclusion**

Based on the foregoing analysis, this Court denies plaintiff's motion for summary judgment [295], grants the State of Illinois defendants' motion for summary judgment [299], and grants the Union defendants motion for summary judgment [303] on Counts X and XI, but denies the motion as to their affirmative defense. Civil case terminated.

IT IS SO ORDERED.

Date: 3/27/2018

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge